Our second case for this morning is Raymond King v. Newbold and others. We will hear first from Mr. Benson. Steven M. Newbold Good morning, Your Honors. It pleases the Court. I am Steven Benson on behalf of Appellant Mr. Raymond King. The District Court's opinion below, granting summary judgment in favor of Appellees, does not follow the Court's en banc decision in Pettys v. Corder. So before you get there, your opponents, the state defendants, Appellees, argue that this Rule 54B order was not properly entered and that this Court has no appellate jurisdiction. So I would like you to spend some time on that. I'm quite concerned about it because we have said that 54B doesn't allow you always necessarily to just pick off defendant by defendant. It really depends on whether a separable litigation package has been resolved in the District Court. And I'm having trouble distinguishing between the kinds of arguments and the kinds of facts that will come up with Drs. Chapman and Gauche, Mr. Newbold on the one side, and the people who are now before us. It seems very interconnected. There may be cross liabilities. And all told, maybe this really ought to await a final judgment, a real final judgment. And forgive me, but while you're answering that question, would you be kind enough to also explain what the extreme hardship was that allowed for the grant of 54B motion that was made more than 30 days after the entry of the order? Long after 30 days. That was another aspect of this, yes. So certainly I will address both. To begin with, at the District Court level, after – so Dr. Newbold was originally found – they found there was a tribal issue of fact with respect to Dr. Newbold and whether or not his conduct rose to the level of deliberate indifference. But it's all about the jaw, right? It's all about who's treating this man's jaw disorder, the TMD, and whether in the end this amounts to deliberate indifference to a serious medical need. Correct. Although each individual defendant – he has a separate claim with respect to each individual defendant. But that happens all the time. Somebody will sue the nurse and they'll sue a doctor, maybe the medical director of the facility, they'll sue a dentist. And if one of those people has provided adequate care and the other two just weren't really that involved with it, you don't find liability against the ones who weren't involved. You say that overall the institution gave the appropriate care. Well, the institution is not the client or is not the defendant here. Well, Wexford is. Certainly Wexford is an institutional defendant. But with respect to each other party, we have individuals, Drs. Newbold and Chapman, who were at Menard and then we have – of course, Wexford was in both Menard and Stateville. And then we also have Dr. Mitchell Lachey, Dr. Saffold, Garg, and also Dr. – I can't remember his name – well, those individuals who were at Stateville. So now all of the – Fitori Bruno is at Stateville? She was at Stateville, although we are not appealing the district court's grant of summary judgment in favor of Fitori Bruno. So when we were at the district court, the only remaining after the judge ruled in favor of Dr. Newbold and dismissed his case based on statute of limitations, the state defendants were entirely out of the case. They were no longer participating in the proceedings. When we were participating in pretrial activities, the state defendants were not attending. Right, that may be true, but this is all one course of conduct over the period of several years, and we have different defendants rendering different forms of treatment at different times, and they all have a different set of their own individual conduct that forms the basis of the claim against them individually, but it's all the same course of conduct. And this is just the classic case of piecemeal appeals rather than one final judgment coming up to this court for a look at the whole case. And if this is permitted 13 months after the summary judgment decision, then we'd be seeing these all the time. Well, I think the summary judgment decision, it is a bit deceiving because the summary judgment decision that maintained Newbold in the case, much later, in fact, I believe it was two months before trial, Dr. Newbold moved for judgment on the pleadings based on the summary judgment ruling. It's still 40 days after that, which isn't quite as troubling as 13 months. Judge Sykes is right. I mean, it's all one organic, if you will, problem that's addressed in a number of ways. That's true. Certainly, Mr. King has TMD that has been treated by numerous defendants or not treated by numerous defendants, and he has a claim with respect to each individual. And although his condition is a chronic and ongoing condition, he has individual claims with respect to each of those individuals. Right, but nothing is more common than that in the prison litigation setting. We have these claims constantly, and there are many defendants who are sued because, of course, it's the nature of prison medical care that prisoners will be seen by many different medical professionals, and they sometimes sue the guards as well. There's always multiple defendants in these cases, and district court resolves claims against each of them in individual distinct orders. But if we allowed separate appeals on 54B judgments in these cases, we'd be doing piecemeal appeals all the time. And I might add that when we have these different defendants, it's a rare case when the facts don't vary a bit from defendant to defendant. The guard may have refused to give somebody medication, or the medical director may have failed to find a referral to a specialist, and on and on. I mean, the facts are slightly different, maybe sometimes importantly different, but we don't take 54Bs. Well, I think it is Mr. King's opinion that the district court correctly determined that these were final judgments against individual plaintiffs, and that the efficiencies, in fact, favored a 54B appeal. Because the problem that the court saw, and that the Wexford defendants also saw with this, is that if we proceeded with the district court case, appealed that, and at the same time appealed the dismissal of all of the other defendants, what would happen is we would go back to the district court, and we would end up re-litigating the entire case with respect to each of the other defendants. Why, if we had an appeal from a final judgment covering both the institution, Wexford, and all of the individual defendants, wouldn't we be in a position to decide, first of all, in the Monell-type theory, what Wexford did? Is this more than just respondee and superior, et cetera, et cetera, and what each individual did, and whether or not it counts as deliberate indifference in light of what all the others were doing? Certainly not on appeal. The court would not be in a position to make a final judgment with respect to each of the defendants that had been dismissed. I don't understand. No, once there's a final judgment, everybody's disposed of. Maybe you've dismissed some people, maybe you've had a trial, and for all I know, found liability with respect to some people. It is what it is. But I believe it is different because it is summary judgment. So there would be two separate inquiries. One would be the determination as to whether or not the jury correctly adjudicated his claims with respect to Chapman and Ghosh, and then there would be a separate issue as to whether or not the district court properly granted summary judgment in favor of Drs. Newbold, Saffold. Right, and nothing is more common than that as well. When you have a suit against multiple defendants and some claims are resolved on summary judgment against some, the case proceeds to trial against others, and then the whole thing comes up after a final judgment. We sort those out all the time. That is true. But in a claim that is fundamentally about the subjective, what is in the mind of the individual defendant, I would pose is different. So when we have to look, there's no question that objectively Mr. King's condition was serious. Then we have to look at the subjective component, which is what was in the mind. Right, that's just an argument on the merits of the summary judgment decision. That's correct. But it demonstrates the finality of the decision with respect to each individual defendant. But the facts overlap. You have to agree with that. The facts and course of conduct, while not identical, overlap to a significant degree. I do not dispute that there is a yes. I think that is true. Although the facts, I don't know if overlap is exactly how I would phrase it. Certainly the fact of his condition and how it should have been treated is common across all defendants. Now how each individual, whether they understood his condition and whether or not they were deliberately indifferent to the serious risk that their failure to treat would cause the harm, is a different and separate set of facts with respect to each individual defendant. And as I believe as Mr. Teresh argued at the district court, he has had similar cases where summary judgment is appealed after the trial. And when it returns, a brand new trial, you have all of the witnesses being called again. We would certainly call Dr. Chapman and Dr. Gosch and Dr. Mitchell-Lachey. All of the same witnesses would be called at the district court if we were to proceed there. And then, assuming that the summary judgment rulings are reversed, we would then go back to the district court. We would recall every witness that was, virtually every witness that had been called previously, and we would re-litigate the issues with respect to each of those individuals. And therefore... Mr. McCoy, is the state's jurisdictional argument waivable, or do we have to consider the jurisdictional question sui sponte, whether it was timely raised by the defendants or not? What do you say? I would say that in the jurisdictional issue, that their failure to waive it, or their failure to raise it at the time that appellants submitted their case statement, is a waiver of the argument on appeal. They, you know, instead of presenting their jurisdictional argument at the outset, instead, they continued to file motions for an extension of time. I believe there were six or seven motions for an extension of time filed by the state defendants in this court, and in no event did they ever raise the jurisdictional issue. When they finally get to briefing the case, their principal argument, which they had all along, I mean, they argued it to the district court, was their jurisdictional argument. Now, Mr. King, who to this day suffers from extreme debilitating pain, and, in fact, had surgery once again several months ago, has been forced to wait. This case has been going on for years, and that conduct by the state to condone that sort of conduct, where they save the jurisdictional argument, continue to file motions for extension of time to file their brief, and then, you know, up to six to nine months later, finally raise the jurisdictional issue, I believe should not be condoned, and I believe we cite cases that criticize, especially institutional defendants, for exactly this kind of conduct. Well, right. The failure to raise the jurisdictional argument by motion early on in the case can be criticized, but it doesn't absolve us of responsibility to consider whether jurisdiction is present. That's our responsibility. So even if there was a failure to raise it as early as possible, as should have been done by motion, the fact that that wasn't done, we still have an obligation. I do believe there is no dispute here that the judgments against these individuals were final. The case had been finally adjudicated with respect to each individual the court granted summary judgment in favor. So the issue is really whether or not the court abused its discretion in granting the 54B. So when you have a final judgment. Well, there's a broader issue than that, and then I actually am going to ask you to take just a minute, in the event we were persuaded by your jurisdictional argument, to make whatever comment you want on the merits.  As Judge Sykes is saying, it really goes to the question whether this fits within 1291. 54B tries to carve out some situations that even though they seem non-final are actually final enough to fit within 1291. So there is an appellate jurisdiction dimension to this. Correct. I certainly understand the court's concern in cases such as this, where you have a patient with a serious chronic condition, he or she is suing multiple defendants, and there is summary judgment adjudication with respect to one or more of those defendants. I certainly can appreciate the concern of the court. Nevertheless, I do not think it changes the fact that the case was finally adjudicated with respect to each of those defendants, and it really comes down to, and I believe this appellate court does have jurisdiction over these claims. Now, we could have a dispute as to whether or not the district court abused its discretion in granting 54B, but I think as a baseline appellate jurisdictional argument, I think this court does have jurisdiction. Schaefer is against you on that. Schaefer was a jurisdictional dismissal. That's the mandate line. And forgive me for asking again, but what was the extreme hardship? I mean, the magistrate judge never uttered those words. So I think the extreme hardship to Mr. King was Mr. King's claims have been pending for years. He is asking for, you know, he is asking for injunctive relief. He filed a motion for preliminary injunction that was never adjudicated. He wants treatment. He wants a treatment plan. That's what he has been asking for in his claim, and it has been denied him. And, you know, the district court has not resolved that specific motion for a preliminary injunction in lieu of going to trial, but trial is delayed. Well, the delay in the trial came about by virtue of the Rule 54B motion. Correct. It came two weeks before trial. So the hardship occasioned by this delay was because of the Rule 54B oral motion two weeks before trial and the apparently erroneous grant of it because of the delay. Mr. King believes that he is unable to get a fair trial with just the defendants that are remaining, that there are issues that are relevant and that a jury should hear everything together, and the district court agreed with that, as did the Wexford defendants. So I am currently in my rebuttal period. I'm sorry. Certainly jurisdiction is an important issue for the court, and I'm happy to deal with that. It's a big issue, and you certainly have briefed the merits as well. If you'd like to offer a crisp sentence on the merits, we will let you finish off during your rebuttal time. I think our dispute with the district court's decision is that he both fails to examine the totality of the care provided by the various defendants, and in a very dismissive way, without any kind of analysis whatsoever, the district court finds that to the extent an appellee provided some care, it was sufficient to satisfy the requirements of the Eighth Amendment, and we think that is contrary to Petty's. We think that the district court, in failing to look at the totality of the circumstances and looking at each patient-client interaction in isolation, caused the district court to improperly frame the subjective element of the claim, namely what was the serious risk of harm that the appellees were aware of and whether or not they disregarded that harm. So with that, I will concede the podium. Thank you. Thank you very much. We'll hear first, I believe, from Ms. Welsh. Yes, good morning, Your Honors. I'm Mary Welsh. I'm here on behalf of the state defendants, and I'll be speaking about the jurisdictional question and the state defendant claims if we get to that, and Mr. Cherish will be speaking about the summary judgment for Wexford alone. Why did the state challenge jurisdiction within 14 days after the date of the appellant's docketing statement? Well, normally, Your Honor, we wouldn't do a motion. Those sorts of motions are entertained by this court when there's one very obvious, crisp decision. The notice of appeal was filed on the 31st day. There's some remaining claim and so on. We've been instructed time and again by this court not to move, to dismiss, For lack of jurisdiction? I mean, I personally sit down with a member of our staff and review stacks of filings for jurisdictional problems, which we try to catch at the earliest possible moment. I can't believe that a jurisdictional, that, sorry, this isn't a final judgment, jurisdictional motion would be disfavored. Right, but this is, well, it seems to me, Your Honor, that this sort of thing is the kind of question that you have to look at the record, you have to abuse of discretion and so on. It's not the sort of clear cut, it's the 31st day question that would prompt a motion that would be entertained. I understand that. So sometimes we ask for supplemental memos. Right, right, right. I mean, I have to say, I mean, I've been practicing in this court for over 20 years. I don't think I've ever had a motion, granted it's always taken with the case. That's not, maybe that's your experience, but certainly such motions are granted. When they have some complexity, that's what I'm saying. I've done many, many jurisdictional memorandums, and I've, you know, mailbox rule, things of that nature, and so on. And those sorts of things where the facts are plain on the face of the record, those are entertained before briefing. But a motion like this where you have to look at the record, you have to see what the parties said at the hearing and so on, where you need all of that information before you, that's the kind of motion that I have always seen has been taken with the case. But that doesn't excuse failing to flag the issue as whichever party spots the thing. So one of the costs of your not doing that is if one looks at the jurisdictional statement in the blue brief that was filed, it's obviously not a motion that was taken with the case, because the appellant had no idea this was coming. Until you filed your brief, they thought, they have their theory that these are proper litigating units. We can think about that. We can discuss it. But had you said, we think this fails to satisfy Rule 54B, the court either would have ordered supplemental memos, which, again, as I can tell you, I'm sure I must see 60 of these things a month, because I review them with a member of our staff as chief judge. Taking it with the case and saying to the parties, this is one of the issues, we need you to brief in your briefs, would have been a more procedurally appropriate. That's true, Your Honor, and I apologize for that. But certainly the plaintiff was on notice, because we objected vociferously in the district court. The plaintiff brought this motion orally at a hearing we didn't even attend. We weren't even supposed to attend a status hearing, because it was about the trial that was coming up in two weeks. And then the court instructed the plaintiff's counsel to let us know that this motion, that they were orally asking for this. And we raised every objection below that we're raising here. The order isn't final. There's an overlap of the facts. The recovery is the same. And also that it's very untimely. There was 13 months, as the court noted, 13 months since the summary judgment order, 40 days since the 12C order. And the court even says, by the way, Judge Wovner asked about hardship. The court even says that there was no showing of hardship and it wasn't making a finding of hardship. So every issue that we raised in the brief and the jurisdictional challenge was raised below. The plaintiff is not taken unawares by this. Yes, I think you're right. It would have been better practice. I have to say I myself didn't realize that there had been all of these problems, because I didn't get the transcript when the case was assigned to me. But, again, I realize that it was not the proper practice, and I do apologize for this. Okay. Well, we'll move on on that note. And let me ask, if we were to get over this, the one individual defendant that gives me the greatest concern is Mitchell, or Mitchell Lausche, as you wish. That person seems to be the one critically responsible for the care. And under petties, we made clear that just because you've thrown some Tylenol at somebody or ibuprofen or whatever, just because you can say we did something isn't the end of the inquiry. We tried to give examples there. And it's not clear to me that summary judgment, again, if we just indulge the assumption we can do this, was appropriate for her. I understand. Well, first of all, I mean, plaintiff's claim against Dr. Mitchell Lausche is mostly, I sent her notes that I wanted her to treat me, and she didn't. But when she's the dental director... Well, is there anything in the record about why she refused to see Mr. King? Well, many of the times she didn't even get his notes, right, because she was doing intake. She wasn't at the clinic. During several periods when he was complaining that she wasn't treating him, she wasn't responding to the notes, she wasn't treating anybody. She was only doing, you know, Stateville has the intake, the regional intake for everybody who comes into the department's custody, and then they're sent, you know, they do x-rays, they do all that stuff, and make sure that whatever someone's medical condition is coming in as a baseline, and then they take, you know, and then they send the individual prisoner to whatever is the proper institution. So she wasn't even there for many of the periods that he's complaining about. But she is the only full-time dentist, the only other full-time dentist. We don't have Fittori Bruno in the case anymore. I mean, somebody has to be doing this, and, like, the buck stops here. It seems that she is the person who is the responsible treating medical. But remember, when she – well, actually, no, because when he – when the plaintiff was transferred to Stateville for the evaluation for surgery, that was Dr. Gosch's domain. He was the only one who could do the actual referrals. He was the only one – and he was treating – you know, there were many, many, many, many instances where Dr. Gosch was seen, you know, saw a plaintiff. Many, many instances. And really, Dr. Gosch was the person who was responsible for his treatment from the day he walked into Stateville, you know, through his retirement in March 2011. Although the facts could be read another way. We have this deposition from Fittori Bruno talking about her discussions with Dr. Mitchell about the treatment of Mr. King, talking about the use of these tongue depressors, tongue blades, talking about, you know, different things. We need to follow up. That meant her, you know, and so she – there is this encounter. So the facts aren't as clear in my mind as you may think about whether this is exclusively Dr. Gosch's problem, he, of course, being one of the people we don't have. Right. But remember, you know, Dr. – after his surgery, Dr. Fittori Bruno was the person who was responsible. She was the dental director. She was, you know, the person who was dealing with his – using the tongue depressors and so on to try to open his mouth and so on. As one of his – as the attending surgeon, who was one of the few people in the country who can do this surgery, said this is good enough. You can use these tongue depressors. And himself, the surgeon, said this. And so, you know, Dr. Mitchell, while she knew, you know, must have known, I would think, that other people were treating him during this period, she only saw him – she herself only saw him in, I believe it was 2010, a couple of times, you know, long, long after the surgery, two years after the surgery.  Are they as effective as the therabyte device? But there's – where's the reasonable argument that physical therapy was not necessary? And, you know, even if a particular doctor can't approve a particular treatment, like seeing a specialist or ordering a test, that doctor can certainly go to the person who can approve the medical need and ask or suggest that it be implemented. Well, I think the evidence is that every one of the state defendants did go – at Stateville, you know, the post-surgical treatment, went to Dr. Gosch and said, you know, what do I do about pain medication? What do I do about this? None of them were familiar with his condition, and certainly not the post-surgical aspect of it. And no one is following the specialist's instructions. Dr. Mitchell-Loshi was familiar with, you know, treating TMD. Am I incorrect? No, she was familiar with the syndrome, according to the evidence in the record. I mean, I'm not sure how plaintiff has personal knowledge of this, but we accept that for summary judgment. But, again, in the post-surgical period, she didn't – I think it's not until 2010, and the surgery was in 2008, right? So she cannot be held responsible for something that her underlings might have done or not done. I mean, that's the respondeat superior problem, right, that you can't be – Well, I've been wondering if it's a conscious disregard of a serious medical need if a treating surgeon declares post-operative physical therapy is mandatory and the prison medical director decides it's not medically necessary and doesn't provide it. Well, that might be true, but that would be the claim against Dr. Ghosh, not against Dr. Mitchell-Loshi, right? No, she's the dental director. She's the dental director. That's what Judge Roper is saying. When the dental director, after dental, after jaw surgery, takes it upon themselves to say, well, actually, I'm better than the specialist, I'm not going to do what the specialist, no therabyte, no – I mean, there's evidence in the record to suggest that these tongue depressors are a very poor option as compared to the devices ordered by the specialist. Well, no, but the specialist, the surgeon himself, the attending surgeon, Dr. Maloro, said his testimony in his deposition was that they were the functional equivalent. I'm not sure. Isn't there evidence? I thought I remembered evidence that at one point one of the doctors just goes out himself and buys the correct device. Well, it is true, actually, that Dr. Edwards, who was the resident at the hospital, one of the surgeons, in fact, I don't know that he went out and bought it, but I think what he said was that the hospital would provide it, and so the hospital apparently delayed in providing it. Months, all of these delays. The hospital delayed, not us. I mean, the hospital said it was going to provide this, and we, like the plaintiff, were waiting for the hospital to provide what it said it was going to provide. But again, Dr. Gosch, I mean, I don't mean to throw him under the bus, but Dr. Gosch had taken over the plaintiff – I mean, was responsible for the plaintiff's treatment throughout. I mean, everybody came to realize that this was a medical, not a dental problem that he had had after the surgery. But look, we have, like, September 9, 2008, Dr. Edwards noting and again ordering physical therapy. September 23, this is what I'm thinking of. It's on page 12 of the opening brief. Dr. Edwards procured a therapeutic device himself and gave it to Mr. King on a follow-up visit, but that's too late because by September 29, only days later, Mr. King's jaw locks shut, you know. So I was remembering correctly. This is a story of an utter failure to follow up on what the surgeon has ordered. There's evidence in the record the use of tongue blades was a deviation from the industry standard because their effectiveness is limited. I mean, that might be true, but that was something that the surgeon himself agreed or said is the functional equivalent. I mean, there might be testimony, but, you know, Petty says that – Well, so it's at least disputed then. You have to agree with that because it's – if the surgeon says, you know, a third best alternative is cardboard tongue blades because – and Dr. Edwards is disapproving that there's no therabyte, but as opposed to zero, is this something? Maybe it is. I think that there's no – Petty says that, you know, ignoring a specialist's orders is circumstantial evidence, and that's not what any of the state defendants did. That might be what Dr. Gosch did, and it might be that Dr. Gosch, who had the authority to order physical therapy, ignored that, but it doesn't mean that we're responsible. The state defendants are responsible for Dr. Gosch's decisions not to order therapy. If there are no more questions, I don't want to eat into the time. That's fine. Yes, thank you. We wish that the court will vacate the decision because there's no appellate jurisdiction and have not affirmed the decision for the state defendants. Thank you. All right. Thank you. Mr. Cherish? May it please the court, I'm Michael Cherish, and I'm here for Wexford Health Sources. I'll try to be brief. I think that the issue with regard to Wexford is fairly straightforward. We know that there's no respondee at superior liability. This court has said that on multiple occasions, I think most emphatically in the Shields case. So what we need here is a policy. I don't think that there's a question of whether or not there is a declared policy, but they claim that there's a custom. They must show a custom or practice. We have to show that it's followed by Wexford employees. It results in a constitutional deprivation. And I think importantly that the conduct is systemic in nature. It's not isolated, and it's not individual to Mr. King. So what do we do with the fact that this is a problem that seems to stretch across at least two institutions, Menard and Stateville? I think Mr. King's problem is alleged to have stretched across two institutions. Well, he's not getting the problem. Wexford provides the medical care at both of those institutions, right? That is correct. Right, so he's shown more than just, you know, I showed up at the clinic at Stateville and I didn't get good treatment. That I could certainly see as a one-off. But he's got some reason to make you think that it's a broader issue than one visit, one clinic, one day. And that's what Mr. King's cause of action against his individual dentists, his individual physicians, his individual physical therapists is all about. Well, don't the surviving claims against Dr. Chapman and Gosch keep Wexford's policies in play? I don't believe so, Your Honor. I think that it is alleged that it is their individual conduct, and plaintiff will have to show their subjective belief or their subjective awareness of deliberate indifference in those cases in his individual case. That's different than if there is a policy which is systemic, which is more than just this plaintiff across the board, which they are acting pursuant to, as opposed to just being allegedly individually deliberately indifferent. That's different, because if you dispose of that, then you dispose of the subjective element of deliberate indifference with regard to a corporate defendant. If you dispose of that. But if a medical professional is only responsible for a prisoner's health at the very moment he or she sees them and treats them, then isn't that a sufficient system? I mean, is that a sufficient health care system? I don't believe that it shows that the violation is systemic. And what I was getting to. How would you show that? I assume extensive discovery of Wexford, looking into the corporate policies, looking into experience, looking into this. How does one get to summary judgment? How is this actually done? I mean, there are two hypotheses. Wexford is doing a good job, and obviously there are some slippages, but there's no deliberate policy that would lead to that. That's theory one. Theory two is that Wexford has a systematic policy of refusing to support physical therapy, refusing to give assistive devices to people, or not disciplining its physicians or dentists who have a very bad record of treatment, whatever. I mean, you could imagine. So in theory number two, Wexford itself is responsible. I don't see how you resolve that without facts. Very simply, I think you have to go to what they have done institutionally in other cases. How does an individual plaintiff do that if not by alleging from what information is available to them that there is a policy to deprive, let's say, of the physical therapy and the devices, and then Wexford, what does Wexford say? Oh, no, we don't have a policy like that. Well, there's facts that need to be developed at some point. Those facts, and again, this is on summary judgment. Plaintiff had the ability to ask Wexford, how many times have you done this in other cases? How many times have you denied physical therapy in other cases? He was pro se, of course. At this time, no, Your Honor. I believe that there was sufficient time to conduct discovery when he had counsel to be able to say, is this systemic? Have you done this before? Have you done this with other people who have my condition? Have you done this with other people who have my needs? That's what you have to show because then that establishes the objective element of deliberate indifference at the corporate level. It shows that they're aware of it and they're disregarding it. Otherwise, what you have are individual treatment decisions, and he has his day in court on those. He's going to trial against Dr. Ghosh. He is going to trial against Dr. Chapman. He will have the opportunity. What I'm saying is that you do not have, that Wexford does not have any system in place for medical professionals to be able to follow medical needs over time and not doing anything to try to have continuity and knowledgeable staff or to get medical records. Of course, it's terribly difficult to demonstrate a policy or practice. Your Honor, I believe you can. I believe all you have to do is conduct discovery on that issue and to ask the question, what have you done in other cases? How many prisoners have had my condition? How many prisoners have been in situations that are similarly situated? So do you know? I believe that the argument Your Honor just made reference to is first raised in the briefs. That was not an argument that was litigated in the district court, and that was not an argument that was presented at summary judgment. Okay, and your time is now up. It is up. Thank you very much. Mr. Benson, I think you've saved a little bit of time. How much does he have? You have a minute. Okay. Well, I want to start very quickly with the jurisdictional issue. Certainly one of the harms the district court noted was that immediately after the summary judgment, Mr. King did file a motion for 54B certification, but because Mr. King was represented by counsel, the district court disregarded that motion, and I think that that was part of the consideration of the district court in determining whether or not it was appropriate. Was it really a 54B motion? Well, he was filing it on his own behalf, but he was seeking certification. He was seeking an appeal of that decision. I thought it was a request for an extension of time. No, I believe I don't have the actual document right in front of me, but I believe that what the district court was relying on was a previous request for certification. Is this the January 23rd, 2014 filing dated by him January 12th? Again, Your Honor, I apologize. I do not have that particular document right in front of me, and I also was not involved in the case, so I don't have it from memory that I can pull it back. The only thing that I was able to find is a request for an extension of time. I'm certainly happy to look for that and see if I can locate the document the district court was referring to. The second point on jurisdiction I would make is that even if the court finds that certification was not proper with respect to Drs. Mitchell-Lachey, Safford, and Garg, it certainly would be proper with respect to Dr. Newbold. Dr. Newbold and Dr. Chapman were at a different institution. There is no overlap in the facts with respect to those individuals, so I would respectfully request if the court is inclined to find it does not have jurisdiction, which we disagree with globally, that it at least adjudicate the claim with respect to Dr. Newbold. With respect to Dr. Mitchell-Lachey, Your Honors referred the deposition of Dr. Fitori Bruno, and certainly she said many things, and one of the things at 79-16 to 82, she explicitly stated that when she left, which was two months after Mr. King's surgery, when she left, the responsibilities for Mr. King's physical therapy was transferred to Dr. Mitchell-Lachey. Also, she specifically discussed this with Dr. Mitchell-Lachey, because she was very concerned that Mr. King would, quote-unquote, fall through the cracks. So I think there is absolutely a factual dispute as to whether or not Dr. Mitchell-Lachey was responsible for physical therapy and whether she failed to provide. Okay. I think you have to wrap up now. Okay. If I might say just one last thing with respect to Wexford, certainly we believe that there was a policy or there was no specific policy in place, and we think that is part of the problem, that with chronic conditions such as this, the way that the system is set up is that there is no inevitable responsibility for anyone to create a treatment plan to prevent deterioration of an individual's condition, and we think that there is enough facts that a jury could find, draw an inference, that Wexford had a policy of custom, of deliberate indifference. Thank you very much, Your Honors. Thank you. And we appointed you, did we not, to this case? Well, certainly Ms. Mimi Addy was appointed. She joined our law firm, and I would say that my representation is pro bono. Well, we thank you very much for your efforts on behalf of your client, and it's a great assistance to the court. Thank you. Thank you very much. And thanks to the other counsel as well.